IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 11, 2005

## STATE OF TENNESSEE v. JERRY BELL

**Appeal from the Criminal Court for Shelby County**
**No. 01-11790, 92, 93, 94, 95     Arthur T. Bennett, Judge**

---

**No. W2003-02870-CCA-R3-CD  - Filed May 10, 2005**

---

The Appellant, Jerry Bell, was convicted by a Shelby County jury of two counts of theft of property under $500, one count of aggravated burglary, two counts of kidnapping, and two counts of rape. As a result of these convictions, Bell received an effective sentence of fourteen years, eleven months, and twenty-nine days. On appeal, Bell raises the following issues for our review: (1) whether the evidence is sufficient to support his convictions, (2) whether the trial court's ruling permitting introduction of his juvenile record was error, (3) whether the fines imposed by the trial court are excessive, and (4) whether he was sentenced in violation of *Blakely v. Washington*. After review of the record, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. C. MCLIN, JJ., joined.

Tony N. Brayton, Assistant Public Defender (on appeal); and Pam Skelton, Assistant Public Defender (at trial), Memphis, Tennessee, for the Appellant, Jerry Bell.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jennifer Nichols, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### Factual Background

Shortly after midnight on May 16, 2001, Todd McCullough commenced his regular morning routine before departing on his job driving an eighteen-wheeler. While walking his dog, Mr. McCullough noticed a black man in the parking lot of his Hickory Farms apartment. Returning to his second floor, one bedroom apartment, he unleashed the dog, said goodbye to his sleeping wife, Emiley McCullough, retrieved his overnight bag, and headed out. When he reached the bottom of

the stairs leading to his apartment, Mr. McCullough encountered the man he had seen in the parking lot minutes earlier. The man pointed a gun to Mr. McCullough's face stating, "shut the fuck up and give me your money." As Mr. McCullough attempted to remove his wallet from his pocket, the Appellant ordered him to return upstairs. After entering the apartment, the two walked back to the bedroom, and Mr. McCullough awoke his wife. Once in the bedroom, the Appellant took Mr. McCullough's wallet and took money from Mrs. McCullough's pants, which were lying at the end of the bed. The Appellant then asked for more valuables, hit Mr. McCullough over the head with his gun, and forced the husband and wife at gunpoint onto a couch in the living room. The Appellant lowered the blinds behind the couch, tore phone cords from the walls of the living room and kitchen, and pulled a dining room chair into the living room. He told Mr. McCullough to sit in the chair and then proceeded to tie his hands and ankles with the phone cords and drape a "dog's rug" over his head, securing it with an Ace Bandage.

After covering Mr. McCullough's face, the Appellant moved another dining room chair into the living room and ordered Mrs. McCullough to sit in the chair. Mrs. McCullough testified, "I sat down in the chair and he stuck his hand down my blouse and started fondling my chest . . . and he started to put his hand down my panties." Mrs. McCullough testified that after she was ordered to disrobe, the Appellant "stood in front of me and he stuck his penis in my mouth" for several minutes. The victim, with a gun to her head, was then raped both vaginally and anally. The Appellant asked the victim "if it felt good . . . or if [her] husband did it this way." The Appellant wore a condom part of the time, but at some point he took it off and stuck it in his back pocket. After allowing her to use the bathroom, the Appellant ordered the victim, still naked, to lead him to valuables in the apartment. He took several of Mr. McCullough's bracelets and rings from the bathroom, as well as a ring sitting on the coffee table in the living room. He also put two cell phones in his pocket. At trial Mrs. McCullough stated, "I told him if he left my cell phone I'd give him my number." The Appellant kept Mr. McCullough's cell phone and returned the one belonging to Mrs. McCullough, after taking note of her phone number. Before leaving the apartment, the Appellant ordered Mrs. McCullough to get dressed, tied her up with a phone cord, and kissed her. After the apartment door shut, Mr. McCullough untied himself, and the husband and wife waited for the Appellant to leave the area outside the unit before calling 911.

On May 16, 2001 at approximately 2:00 a.m., Sergeant Anthony Williams with the Memphis Police Department secured the scene. Mrs. McCullough was subsequently taken to the Sexual Assault Resource Center, also known as the Rape Crisis Center, where she was examined by Dr. Margaret Aiken. Dr. Aiken testified that she performed a pelvic exam and found an abrasion of the posterior fourchette, as well as bruising and a laceration or tear in the anal area. She opined that the victim had been sexually assaulted. Sholar Howard, also a forensic nurse at the Rape Crisis Center as well as a nurse practitioner, agreed with this finding, stating that the sex was "definitely not consensual." Aiken also drew blood and obtained oral, vaginal, and anal swabs. She placed this evidence, along with the victim's panties, in a rape kit which she sealed and sent to the Tennessee Bureau of Investigation.

After going to the Rape Crisis Center, both victims made statements at 201 Poplar. Mr. McCullough was shown a photospread and identified a man who was not the Appellant. Separately, Mrs. McCullough looked at the same photospread and wrote "I don't see the guy who assaulted me" but circled the same man as her husband and wrote "he looks a lot like this guy."

Approximately twenty minutes after the Appellant left the McCulloughs' apartment, Mrs. McCullough received a call on her cell phone from her husband's phone and recognized the Appellant's voice on the other end of the line. Mrs. McCullough told the police about this call, and she testified that the police developed a plan for her to remain in contact with the perpetrator. Calls were made back and forth between the two cell phones. Richard Harlow, a special agent for the United States Secret Service assigned to the Memphis field office, testified that he was asked to assist the Memphis Police Department in locating the suspect in this case by tracking the stolen cell phone. Two agents flew to Memphis from Miami on May 16 with the necessary technology, and they were able to "triangulate" the phone's area of transmission and locate the cell phone at a house at 6215 Village Park.

Sergeant Mark Miller, an officer with the robbery bureau of the Memphis Police Department assigned to this case, testified that, based upon the cell phone signals, the police located the Appellant hiding in a bedroom closet inside a house with the cell phone in his pocket. Subsequently, the suspect was taken into custody, and a photospread was prepared containing the Appellant's picture. The victims returned to 201 Poplar to view this photospread, and both made separate positive identifications of the Appellant. Miller also testified that once in custody, the Appellant was given his Miranda rights, signed a written waiver, and made the following statement:

Q: Did you participate in the robbery and rape of a female white, which occurred at the Hickory Farms Apartments, on May 16, 2001 at or about midnight?
A: Yes.

Q: Were you armed with a weapon?
A: Yes, a 45.

Q: Was a vehicle used during this robbery?
A: No.

Q: What did you get as result of the robbery?
A: About $100.00, a ring, and a cell phone.

Q: Describe to us in detail the events surrounding this robbery/rape?
A: I walked into the complex about 12:00 and saw someone walking a dog. I walked around that way and saw her husband outside. I pulled the gun and took him upstairs to the apartment. I told him "who else in the apartment?" he said his wife. He then opened the door and we walked in, and I went into the bedroom and saw his wife in the bed. I got some money out of her pants off the floor and the money out of his

-3-

wallet. I took them back to the living room. I sat him down in a chair, tied him up with a telephone cord, and put a towel over his head. She was sitting on the couch and I searched the house. She got off the couch and started talking to me telling me where stuff was. I took her into the bedroom; she was opening drawers and stuff. She was sleeping in panties and a bra, I pulled her panties off, and told her to bend over. I stuck my dick in and started raping her. We did that for about thirty minutes then I tied her up and left.

Q: Did you ejaculate inside the female victim?
A: Yes, I had a condom on at first but it broke.

Q: In addition to sexual intercourse did you have oral or anal sex with the victim?
A: Yes, both.

The Appellant also gave a written consent for DNA testing, and a nurse practitioner took a blood sample.

Chad Johnson, a serologist and DNA analyst with the Tennessee Bureau of Investigation, testified that he received the rape kit from the Sexual Assault Resource Center, as well as an envelope containing a dry blood standard and hair envelope from the Appellant. He detected semen and sperm on a vaginal slide, which was prepared from a swab taken by the Rape Crisis Center. Johnson compared the Appellant's DNA profile with that which was obtained from the victim and found "a match."

In September 2001, a Shelby County grand jury returned an indictment against the Appellant charging him with one count of aggravated burglary, two counts of aggravated robbery, two counts of especially aggravated kidnapping, and two counts of aggravated rape. Following a jury trial, the Appellant was found guilty of two counts of theft of property under $500,[1] one count of aggravated burglary, two counts of kidnapping, and two counts of rape. The trial court sentenced the Appellant to eleven months and twenty-nine days for each theft conviction and ordered that these sentences be served concurrently. The court then merged the Appellant's two convictions for kidnapping into one and imposed a sentence of six years.[2] The court also merged the two convictions of rape into one and imposed an eight-year sentence.[3] Finally, the trial court ordered that the sentences for aggravated burglary, kidnapping, rape, and the concurrent sentences of misdemeanor theft be served consecutively, resulting in an aggregate sentence of fourteen years, eleven months, and twenty-nine

---

[1]The Appellant's theft convictions stem from his indictments for aggravated robbery.

[2]The record reflects the Appellant was alternatively indicted upon different theories of kidnapping. Thus, these counts were merged properly.

[3]The record does not reflect why these offenses were merged, only that merger is shown on the judgment form. The counts, as indicted, for the offenses of aggravated rape did not charge in the alternative.

days. In addition, the trial court imposed a $2,500 fine for each theft conviction as fixed by the jury. The Appellant's motion for a new trial was denied with this appeal following.

**Analysis**

### I. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his convictions. Specifically, the Appellant states that his "convictions are based upon the often conflicting testimony of the alleged victims and his confession." He argues that due to the victims' initial identifications of another individual as the alleged perpetrator of the offenses, the evidence is insufficient to establish that he committed the crimes. We apply the rule that where the sufficiency of evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 433 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13 (e). The scope of our examination of the evidence is not equivalent to that of the jury's. In a challenge to the sufficiency of the evidence, this court does not retry the defendant. We emphasize that our examination in a sufficiency review is not to revisit inconsistent, contradicting, implausible, or non-credible proof, as these issues are resolved solely by the jury. Rather, we look to the record to determine whether there was substantive probative evidence to support the verdict. The second inquiry, the question of legal sufficiency, then follows: whether the record contains evidence from which the jury could have found the essential elements of the crime beyond a reasonable doubt. Every reasonable hypothesis of innocence need not be dispelled; it is only necessary that there exists proof which supports the elements of the crime. The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given to the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court will not reweigh or reevaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

The proof at trial overwhelmingly supports the jury's verdict. In his statement to the police, the Appellant admitted that he entered the victims' apartment without their consent. He admitted that he confined the victim, Todd McCullough, by tying him to a chair with a phone cord. He admitted that he stole money and a ring from Emily McCullough and that he stole money and a cell phone from Todd McCullough. He also admitted that he sexually penetrated the female victim. The Appellant was identified by both victims as the perpetrator of the crimes committed against them. The Appellant's DNA matched the DNA samples taken from the victim. At the time of the Appellant's arrest, he was in possession of the cell phone stolen from the victims' apartment. Accordingly, we conclude that the evidence at trial is legally sufficient to support the Appellant's convictions for aggravated burglary, two counts of misdemeanor theft, kidnapping, and rape. *See* Tenn. R. App. P. 13(e).

## II. Juvenile Court Record

Next, the Appellant argues that "[t]he trial court committed error in ruling that the State could introduce evidence of the [Appellant's] juvenile record if the [Appellant] questioned a State's witness regarding the [Appellant's] age at the time of his confession." First, we are constrained to note, following review of the record, that we are unable to locate any ruling by the trial court which supports the Appellant argument that the trial court permitted introduction of his "entire juvenile record" before the jury.[4] At trial, the Appellant did object to a ruling of the trial court upon grounds that the ruling unduly restricted the Appellant's cross-examination of a State's witness. The record on this issue, which was developed during a jury-out hearing at trial, consumes twenty-three pages of transcribed testimony and argument. Nowhere in the Appellant's brief does he make reference to the page in the record containing the trial court's ruling, which he now challenges, as required by Tenn. R. App. P. 27(g). Thus, this issue is waived. Nonetheless, we elect to review the issue upon its merits.

At the time of the Appellant's arrest for these crimes, he was sixteen years old. During cross-examination of the State's witness, Sergeant Miller, the Appellant sought to impeach Miller by establishing that the sergeant never contacted the Appellant's parent or guardian prior to taking the Appellant's statement. The State argued that contact of a parent was unnecessary because Tennessee Code Annotated section 37-1-134(c) (2003) removes the requirement of parental contact under the facts of this case.[5] At the jury-out hearing on this issue, Miller testified that he did not contact a parent of the Appellant because he learned during his investigation that the juvenile court had previously transferred the Appellant to adult court in an unrelated burglary case. Miller testified that it was his understanding that contact of a parent or guardian was unnecessary. Miller also testified that before making the decision not to contact, he obtained a copy of the transfer order transferring the Appellant from juvenile court to criminal court. At the conclusion of the jury-out hearing, the trial court ruled that should the Appellant attempt to impeach Sergeant Miller regarding his failure to contact a parent, the State could then introduce the fact that under Tennessee law, no contact was necessary due to the Appellant's transfer from juvenile court to adult court in a prior case.

The Appellant argues that this ruling violates Tennessee Code Annotated section 37-1-133(b) (2003) which provides in pertinent part:

---

[4]Indeed, at one point during this protracted hearing, trial counsel informed the court ". . . I don't want his prior record getting in," to which the court responded, "well, you don't have to get his prior record in." Moreover, we are unable to locate any trial court ruling which focused solely upon the question of the Appellant's age at the time of his confession.

[5]Tennessee Code Annotated section 37-1-134(c) provides, in relevant part, that the "transfer [of a sixteen-year-old] pursuant to subsection (a) terminates jurisdiction of the juvenile court with respect to any and all delinquent acts with which the child may then or thereafter be charged, and the child shall thereafter be dealt with as an adult as to all pending and subsequent criminal charges . . ."

The disposition of a child and evidence adduced in a hearing in juvenile court may not be used against such child in any proceeding in any court other than a juvenile court, whether before or after reaching majority, except in dispositional proceedings after conviction of a felony for the purposes of a pre-sentence investigation and report.

First, we would observe that a transfer order from juvenile court to criminal court is not a dispositional proceeding as contemplated by the statute. We find the Appellant's argument on this issue somewhat disingenuous. We agree with the State that it would not be in harmony with the primary function of a trial, as a truth-finding expedition, to allow the Appellant to present to a jury through Sergeant Miller's testimony the impression that Miller erroneously failed to contact the Appellant's parent or guardian. We conclude that the trial court did not abuse its discretion in allowing the jury to learn why the Appellant's parent or guardian was not contacted prior to the taking of his statement should the Appellant "open the door" on this issue.

## III. Amount of Fine

"When imposing sentences, after the sentencing hearing, the court shall impose a fine, if any, not to exceed the fine fixed by the jury." Tenn. Code. Ann. § 40-35-301(b) (2003). Any challenge to the amount of the fine imposed by the trial court should be conducted in accordance with the principles of the 1989 Sentencing Act. *State v. Bryant*, 805 S.W.2d 762, 767 (Tenn. 1991). The defendant's ability to pay is one factor to consider in establishing a fine, but it is not necessarily a controlling factor. *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). A court should also consider other factors including "prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors that are relevant to an appropriate, overall sentence." *State v. Taylor*, 70 S.W.3d 717, 723 (Tenn. 2002). The seriousness of an offense may also support a punitive fine. *Alvarado*, 961 S.W.2d at 153.

The Appellant argues that he is an indigent youth ordered to serve a lengthy period of incarceration and is unable to pay the $5,000 fine assessed in the two misdemeanor cases. There are no findings of fact by the trial court concerning the Appellant's ability to pay; therefore, our review is *de novo* without a presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Although the record does not contain an affidavit of indigency, we note that the Appellant was represented by the public defender's office at trial. However, the Appellant does have an extensive history of juvenile adjudications. Notably, the trial court found seven enhancement factors and no mitigating factors when sentencing the Appellant. Moreover, we conclude that the offenses for which the Appellant was convicted were significant. Thus, we find adequate support for the trial court's imposition of $2,500 fines for each of the Appellant's two theft convictions. Therefore, this issue is without merit.

## IV. Sentencing

The Appellant argues that the trial court's imposition of enhanced sentences and imposition of consecutive sentences violate his Sixth Amendment right to trial by jury as recognized by the

Supreme Court's holding in *Blakely v. Washington*, 542 U.S. _____, 124 S. Ct. 2531 (2004).[6] First, we would note that this issue is waived because it was not raised by the Appellant at the sentencing hearing. *See State v. Edwin Gomez and Jonathan S. Londono*, M2002-01209-SC-R11-CD, (Tenn. Apr. 15, 2005), *pet. for reh-g filed*, (Apr. 20, 2005). Moreover, our supreme court held in *Gomez* that the Sentencing Reform Act of 1989 does not violate the Sixth Amendment guarantee of a jury trial and was, thus, not affected by the *Blakely* decision. *Id.* Accordingly, this issue is without merit.

## CONCLUSION

Finding no reversible error, the judgments of conviction and resulting sentences are affirmed.

_____
DAVID G. HAYES, JUDGE

---

[6]The Appellant presents no challenge to his enhanced sentences or consecutive sentences under the 1989 Sentencing Act.